# MINNIER v. SEDALIA, WARSAW AND SOUTHWESTERN RAILWAY COMPANY, Appellant.

## Division One, February 19, 1902.

1. **Negligence: TOOLS: SAFETY.** The duty of the master is to use ordinary care and diligence in selecting and furnishing safe and suitable tools and implements for the use of his servants.

2. ———: **TOOLS IN ORDINARY USE: INFERENCE.** No inference of negligence can arise from evidence which shows that the instrument used was such as is ordinarily used for like purposes by persons engaged in the same kind of business.

3. ———: ———: **ASSUMPTION OF RISKS.** The servant in entering the service of the master assumes the risks that ordinarily and usually are incident to the business being conducted by the master, and his wages include compensation for injuries received from such risks.

4. ———: ———: ———: **OBVIOUS DEFECTS: QUITTING SERVICE.** If the master fails to furnish safe appliances, and if the servant knows, or by ordinary care could know, that they are not altogether safe, he

is not obliged to refuse to use them or quit the service, if he reasonably believes that by the exercise of proper care and caution he can safely use them notwithstanding they are not reasonably safe; and if he does use them and exercises such care and caution and is injured, he does not waive his right to compensation for injuries received in consequence, nor is he guilty of contributory negligence. But if the appliance is obviously so dangerous that it can not be safely used even with care and caution, that is, if the danger of using it is patent or such as to threaten immediate injury, then the servant is guilty of contributory negligence if he uses it, and the master is not liable notwithstanding his prior failure of duty to supply safe appliances. And the instructions set out and discussed in the opinion fall short of the full measure of this rule.

5. ————: INSTRUCTION: NO EVIDENCE: NARROW-GAUGE CAR. Where there is no evidence that a broad-gauge car mounted on narrow-gauge trucks on a narrow-gauge track is an unsafe appliance, the instruction should not assume that such use of such car is negligent. Nor was the use of such car, under the facts disclosed by this record, negligent.

6. ————: ASSUMPTION OF RISKS: OBVIOUS OR ORDINARY DANGER: EXCEPTION TO THE RULE. The servant assumes more than such risks as are obviously so dangerous as to threaten immediate injury. This is an exception to the rule, which is, that the servant assumes the risks ordinarily and usually incident to the employment. An instruction should not state the exception and omit the rule, for that is to make the exception to the rule the rule itself.

7. ————: CONFLICT OF EVIDENCE. However conflicting the evidence may be, the courts will not disturb the verdict if the jury has been properly instructed.

Appeal from Benton Circuit Court.—*Hon. W. W. Graves,* Judge.

REVERSED AND REMANDED.

*M. L. Clardy, Wm. S. Shirk, James Humphrey* and *Henry P. Lay* for appellant.

Instruction 13, as asked by defendant, is the law. The evidence shows that the car, the forward truck of which was derailed, had been made for and adopted as a part of the car equipment of the company and had been in repeated use on

its road in trains operated by the deceased before the accident. These became a part of the implements with which defendant conducted its business, and if these increased the risks of the employment in which deceased was engaged they became a part of the ordinary risks which the employee, by continuing in defendant's employment, assumed. Jackson v. Railroad, 104 Mo. 448; Ragon v. Railroad, 97 Mich. 265; Junior v. El. L. & P. Co., 127 Mo. 79; Bradley v. Railroad, 138 Mo. 293; Fugler v. Bothe, 117 Mo. 475; Burns v. Railroad, 129 Mo. 41; Potter v. Railroad, 71 Mo. 67; Price v. Railroad, 77 Mo. 508; Bohn v. Railroad, 106 Mo. 429; Titus v. Railroad, 136 Pa. St. 618.

*Sangree & Lamm* and *Montgomery & Montgomery* for respondent.

(1)   The first and second instructions given by the lower court, upon the request of the plaintiff, properly declared the law upon the case made by the plaintiff's evidence.   The charge in the petition that the defendant did not exercise ordinary care in providing reasonably safe appliances for the use of the employee injured, and that the appliances furnished were unsafe and dangerous, was fully supported by the evidence.   The instructions both refer to that character of appliances, and if the defendant wanted an instruction on its own theory that these appliances were reasonably safe, and that the master had exercised ordinary care in providing them, he should have asked it.   The failure of the lower court to so instruct the jury, when the defendant had not asked such an instruction, is not error.   (2)   It is the duty of the master to furnish reasonably safe appliances, and if he neglects this duty, and furnishes those which are not reasonably safe, the servant's knowledge of its unsafe character does not relieve the master of his liability unless the risk is so obvious as to threaten immediate injury.   Then if the servant may reason-

ably believe that by the exercise of proper care and caution he may safely use such an appliance, and he does exercise such care and caution, he does not thereby waive his right to compensation for any injury which may follow such use, nor is he guilty of contributory negligence. Huhn v. Railroad, 97 Mo. 447; O'Mellia v. Railroad, 115 Mo. 218; Mahaney v. Railroad, 108 Mo. 201; Soeder v. Railroad, 100 Mo. 681; Hamilton v. Mining Co., 108 Mo. 375; Holloran v. Iron Co., 133 Mo. 476; Booth v. Railroad, 75 Mo. App. 516; Smith v. Coal Co., 75 Mo. App. 177; Grattis v. Railroad, 153 Mo. 380; Tabler v. Railroad, 93 Mo. 79; O'Mellia v. Railroad, 115 Mo. 221; Norton v. Ittner, 56 Mo. 351; Cosgrove v. Leonard, 134 Mo. 426. (3) The servant assumes the usual and ordinary risks incident to the business as it is conducted by the master. If it be more dangerous than the method ordinarily adopted, the servant assumes the added risk, but at the same time a higher degree of care is imposed upon the master. The master's duty must be commensurate with the risk assumed by the servant. To establish a degree of care upon common usage, the usage must be shown to be so general and universal as to cover all the varying conditions under which such lines of railroads may be operated. Railroad v. McDaniel, 107 U. S. 454; Railroad v. McDade, 135 U. S. 554. (4) The thirteenth instruction, as prayed by the defendant, was properly refused by the court below because it omits Minnier's knowledge or such knowledge as he might have acquired by ordinary care. Bradley v. Railroad, 138 Mo. 293.

MARSHALL, J.—The plaintiff recovered a judgment for five thousand dollars damages for the death of her husband on the second of November, 1897, caused by an accident on the defendant's road at a point about three miles north of Warsaw. Her husband was the engineer of the train. The defendant appeals.

The negligence charged in the petition is, "*first*, that the

roadbed, track, ties, bridges and trestles were out of repair and were not in a reasonably safe and sound condition; *second,* that the defendant failed to furnish a sufficient number of competent brakemen to handle the train, and that one of those employed was incompetent, unskilled and inexperienced; and *third,* that the defendant's road is a narrow-gauge road, three feet wide, and that the defendant negligently put a broad-gauge car mounted upon narrow-gauge trucks in the train, heavily loaded, so that the same was top-heavy, and that said car would not adjust itself to the tracks and curve, and that in consequence of all such alleged negligent acts the broad-gauge car, so mounted, left the track and became derailed, and that by reason of the insufficiency and incompetency of the brake-man, the train could not be stopped until it was on a trestle or bridge, with the result that the top-heavy broad-gauge car broke through and toppled over, pulling the said locomotive with it," and killing the engineer, the plaintiff's said husband.

The answer is a general denial, except as to the owner-ship of the road, and the fact that the plaintiff's husband was the engineer, and a special plea of assumption of risks, among which was the risk that caused the accident.   The reply is a general denial.

The defendant owns a narrow-gauge railroad, running from Sedalia to Warsaw, and the deceased had been employed as an engineer on the road for quite a long time before the accident.   The train in question consisted of the engine, six freight cars, loaded with merchandise, a baggage car and a pas-senger car. The broad-gauge car mounted on the narrow-gauge trucks, was placed next to the engine, which the evidence shows was the usual and proper place to put it, and was loaded to within six or eight inches of the top with shingles.   The accident occurred at a bridge or trestle about three miles north of Warsaw.   There is a slight curve in the road just north of the trestle, and a down grade.   The broad-gauge car was sound, well constructed, and had been in use on the road about

a month or six weeks before the accident. When the train approached the trestle it was moving slowly, with steam shut off and under good control. The trestle or bridge was about 300 feet long. About one hundred and ten or fifteen feet north of the bridge or trestle the forward trucks of the broad-gauge car jumped off the track. The rear trucks remained on the track. This caused the cars behind it to also leave the track. The train ran on, the forward trucks of the broad-gauge car and the trucks of the other cars running or bump-ing on the cross-ties, until all the train except the passenger car was on the bridge or trestle. Then the engineer succeeded in bringing the train to a full stop. When this was done one of the narrow-gauge cars about the middle of the train toppled over and fell off the bridge, and this caused the cars behind and before it to also turn over alternately, that is, first one behind it and then one in front of it, until the broad-gauge car was finally affected, and it then turned over and fell off the bridge and dragged the engine over with it. The cars fell to the bot-tom of the ravine, which was some thirty or forty feet deep, measured from the top of the bridge. Every one jumped off and escaped injury except the engineer. He went down with the engine and was killed. The broad-gauge car was num-bered 1001. The evidence as to the condition of the track and the trestle is so conflicting, as to leave no doubt that the witnesses on one side or the other, committed rank perjury in describing it. Counsel for plaintiff have submitted the fol-lowing epitome of what their witnesses swore to:

"For instance, as to the condition of the track:

"*First:* The evidence clearly shows that at a point three or four feet, at least very close, to the place where the trucks of the car No. 1001 jumped the rail there was a low joint and a body of ties so decayed and unsound as to be wholly in-capable of supporting the rail; that at this point the wheels of the truck under the car 1001 mounted the rail and ran along for three or four feet upon the ball of the rail and then

fell down upon the ties.    From this point up to the commence-
ment of the trestle, which was 110 feet, the ties were put in
about twenty-five inches from center to center, and this would
make forty-eight ties between these two points, and some wit-
nesses who counted the ties put the number at forty-eight.
Other witnesses stated the number of ties between these points
was forty-five.    The great bulk of the ties between these points
were shown by our witnesses to be rotten, decayed and doty.
Some of said ties, while on the surface appearing all right,
were a mere shell and rotten on the inside, and the witnesses
estimated the number of such rotten ties in said 110 feet
from fifteen to twenty-nine.    For instance Mr. Gregg, one
of our witnesses, puts the number at fifteen.    Mr. Allen puts
the number at twenty.    Other of our witnesses put the num-
ber of rotten ties from fifteen to twenty, while of defendant's
witnesses, Mr. Harvey puts the number at twenty-nine; and
other of defendant's witnesses put the number at from four
to five.    The wheels of the trucks crowded the ties together,
cutting, smashing and breaking many of them.    On the day of
the wreck, as soon as the news of it reached Warsaw, a great
number of people came out to see it.    Some of these interested
themselves in ascertaining the cause of the wreck and in exam-
ining the condition of the track.    They found this low joint
and rotten ties as stated.    Some of the ties that were left in
the track were so rotten that with fingers and toes these people
pulled out a great number of spikes.    One witness pulled out
ten with his fingers.    Others pulled out a number with their
toes.    These spikes so pulled out were remaining in the ties
in place as originally driven, but by reason of the rotten con-
dition of the ties they would not hold in the ties and could
be removed as aforesaid.    Even after the track had been re-
built so trains could use it, other witnesses visited the point
and one witness pulled seventeen spikes out of the old ties re-
maining in place in the manner narrated above, and other
witnesses saw this done.    In short, a great number of witnesses

were examined as to the condition of this track north of the trestle and their testimony is uniformly to the effect above and showed the track to be in a deplorable condition. By other witnesses it was shown that the track north of the trestle was out of line; the rails were warped and twisted by the derailment, and the evidence tended to show that when the car 1001 jumped the rail this derailed other cars of the train and that these other cars fell over the trestle when the train had come to a standstill.

"Then, again, take the condition of the trestle.

"*Second:* The trestle was apparently in about as bad condition as the track. The piling which supported the trestle had been put in in 1890 and many of them were rotten close to the ground. All of them were more or less rotten and insecure. The sway braces were broken from their fastenings and were shown to be rotten and doty. The spikes which held them in their place only entered the piling about two inches and much of the other part of the piling was rotten. The guard rail on top was unsound and rotten in many places. The ties in the trestle were sawed ties laid about eight inches apart, and had they been sound would have supported the train and, in spite of the derailment, would have prevented it pitching over the trestle, but as the cars went over it the ties broke in two on account of their rotten condition. Mr. Wm. F. Steele, who was an employee of the defendant, stated that there were a hundred rotten ties on the trestle between the place where the locomotive left the trestle and the north end of the trestle. The uniform testimony of a great host of the plaintiff's witnesses was to the same effect as to the rotten and unsafe condition of the trestle. At the point in the trestle at which the first car, when the train had stopped, fell to the ground, there were shown to be a collection of rotten ties in the trestle which broke when the derailed truck ran upon them and, after swaying backwards and forwards a little, went

over the side, carrying with it the balance of the train and the locomotive."

On the other hand, counsel for the defendant has submitted the following analysis and summary of the testimony in respect to the track and the bridge:

"The accident in which said John Minnier lost his life was occasioned by the wheels under the forward truck of car 1001 leaving the rails at a point approaching a high trestle. The wheels bumping over the ties on the trestle caused the car to sway from side to side and to carry it over the side of the trestle, and to pull over with it the engine and other cars standing on the trestle.

"In an attempt to account for the wheels of the forward truck of car 1001 leaving the rails, the plaintiff offered considerable testimony as to the condition of the cross-ties under the rails at or near to the place where the derailment occurred. But decayed ties in the track do not account for the derailment. The only part of the train derailed was the forward truck of the car 1001. There were in the train besides the engine, six freight cars, a baggage car and coach. The engine and the seven other cars ran over the rails and on to the trestle and remained on the rails until pulled off by the car next to the engine. Even the wheels under the rear truck of car 1001 remained upon the rails after the wheels of the forward truck were running over the ties on the track and on the bridge, and this rear truck with several other pair remained on the rails even after the car bodies had been pulled off the bridge.

"The same witness, who was the general superintendent of the road, states that the morning after the wreck he made a thorough examination of the track at the place of derailment and some distance beyond. This was before any repairs had been made to the track after the wreck. He made an examination from the north end of the trestle about a quarter of a mile, principally along the place of derailment, inspecting the rails, ties, joints and everything in connection with it. Ex-

amined the fish plates and found them in proper place, and bolts, nut and nut-locks and found them in perfect condition. The rails were not disturbed in any way where the derailment occurred. Before any work was done a train was run over it. He further states on same page that he measured the gauge and elevation of the track. He did not measure the curve; 'that is only a slight curve and I have forgotten the degree of it, according to the three foot standard, and the track all along there was in perfect gauge. The elevation of the outer rail was from one and one-half to two inches as the curve was running into a tangent.'

"Patrick Curran, section foreman, also on the morning after the wreck, made a like examination. He found the joints in secure condition and the rails in proper gauge and line. He states that a train passed over the track north of the trestle where the derailment occurred without any repairs. This witness was put in charge of the repairs to the track north of the trestle after the wreck, and, he describes what repairs were made. His statement in substance is that: 'I put in, I think, five or six new ties, and that is all the work I did on it.' He did not change the elevation of the rails, nor disturb the earth at all except where new ties were put in. The new ties were put in close to the trestle. Five or six ties partly broken by wheels passing over them, not enough to prevent the train from passing over them with perfect safety. The broken ties did not disturb the rails at all.

"James Watts, section foreman of the section of the road where the accident occurred, was at the scene of the wreck within an hour after it occurred, and made an examination to see what was the cause of the accident. His testimony is substantially the same as that of Patrick Curran's. He further states that the condition of the track near the trestle where the accident occurred, was good and well maintained before the accident. That it was under his care and he went over it every day.

"To the same effect as to condition of the track and rails is the testimony of Paul Beemer. This witness made the examination of the track at the place of the accident the same day it occurred.

"Also the testimony of Robert Beaty, who was on the ground within two or three hours after the accident and examined the track. The rails had not been disturbed in any way that he saw. Between the point of derailment and the trestle he saw one rotten tie and several broken off by the wheels running over them.

"Joel Chaney walked over and looked at the track the next morning after the accident, he states that he saw no worn rails, nor any loose rails, nor any out of line.

"W. H. Ryan examined the track at the same place the same day and shortly after the accident. Where the derailment occurred, the rails were not disturbed or moved. The rails were not worn or battered. Between the place of derailment and the end of the bridge he saw not over half a dozen partially decayed ties. He further states that he afterwards used the guard rails taken from the south side of the bridge and some of the broken cross-ties from the bridge, that with the exception of about two feet of guard rail the timber was sound.

"W. W. De Jarnett, a witness, testified in substance, that he was at the scene of the wreck about an hour after it occurred. His testimony corroborates the foregoing.

"Ira Gill, a witness for the plaintiff, testified that he noticed one rail in the track spread out half an inch. He is the only witness that pretends to have seen a rail spread, though many others examined the track. He didn't measure the gauge, he judged with the eye. If it had spread enough to let the wheels of one truck off it is difficult to see why the rest of the train following the derailed truck did not also leave the rails.

"J. W. Bagby, a witness for plaintiff, examined the place

of the accident the same day and he says with some care, and he states, 'I think the rails were in their natural shape.' . . . . He didn't see any indication of displacement of the rails.

"Another witness for plaintiff, Wingate, testified that a rail was turned over in the track. This and the witness, Gill, were evidently exercising their imagination in an effort to divine the cause of the derailment of the forward truck of car No. 1001. This last theory has to account for the rest of the train remaining on the rails while in motion, and it is not creditable to the ingenuity of the witness.

"Fred and Ike Trinder, brothers of the plaintiff, testified that they visited the place of the accident two days after it occurred, and after repairs had been made to the track, and the operation of regular trains had been resumed between Sedalia and Warsaw. These witnesses testify to have found a joint three or four feet from the point where the wheels of the truck mounted the rail and went over the ties, under which there was a rotten tie affording no support to the rail; that the joint was held together by fish plates through which there was but one bolt to hold the fish plate. On cross-examination the last-named witness testified: 'Q. How wide was the space where you saw the joint, three, four or five feet north of the point of derailment of the car, where the joint had no support from the ties? A. I should say from fifty to sixty inches.'

"The witness Watts testified that he measured the distance from the north end of the trestle to the point where the wheels left the rails, which was 115 feet; also the distance from the latter point to the next joint north, which was twelve feet. To the same effect was the testimony of Patrick Curran.

"In addition Mr. Rohwer, a civil engineer, testifies that the effect on the engine passing over such a joint as that described by the Trinders, would be to cause it to swing over;

'that would be the natural consequence of bending the rail; if the rail bent, it would swing the engine over.'

"It would have been exceedingly singular if such a gap existed in the track, it would have eluded the search of so many others who made examinations, and those who repaired the track before the Trinders came there; and that the engines and trains should still continue to pass over it safely and, so far as it appears, without the engineer or other employees on the trains being sensible of its existence.

"It was shown, by the testimony of Superintendent Inge, that he was in the habit of going over the road three times a week and sometimes every day. Part of the time he rode on the engine and on the rear end of the coach, and from experience could easily tell if there was a loose joint. He went over the track the day before the accident from Sedalia to Warsaw and back. He states that no such loose joint as that described by the Trinders existed there, that if it had it would have been impossible for him not to have seen it."

In respect to the charge of overloading the broad-gauge car, the plaintiff introduced several witnesses who testified that the car swayed more than the narrow-gauge car, but none of them attempted to say that the car was overloaded or to qualify themselves to give an opinion on that question. On the other hand the defendant introduced testimony showing that the car was not overloaded.

The plaintiff admits that the charge that there were not enough brakemen on the train is not sustained by the proof, but still insists that the evidence showed that one of the brakemen was incompetent. The defendant contends that the evidence fails to show this.

Touching the charge that the defendant was negligent in putting the broad-gauge car mounted on narrow-gauge trucks in the train or in using it on a narrow-gauge road, the plaintiff introduced no evidence whatever. On the other hand the defendant showed by the testimony of Herman J. Smith, its

foreman of car repairs in its shops in St. Louis, who built this car, that such a car, on such a road, was standard built and safe.    The defendant also showed by conductors, superintendents, engineers, master mechanics and superintendents, on the Burlington & Western, and Burlington & Northwestern railroads, in Iowa, and on the Denver & Rio Grande Railroad, in Colorado, which are narrow-gauge railroads, that it is the uniform practice on those roads to transfer broad-gauge cars to narrow-gauge trucks and to run them over those narrow-gauge roads, and that experience has proven that it can be safely done, even when such cars are loaded with from 30,000 to 60,000 pounds and are run at a speed of from eighteen to twenty-five miles an hour.

The plaintiff contends, however, that the experience and practice on these two narrow-gauge roads does not establish a custom on all the narrow-gauge roads in the United States (no other narrow-gauge roads are shown by the record in this case to be in operation in the United States) and that the plaintiff is only bound by a custom which has become uniform among all narrow-gauge roads, and moreover that the deceased is not shown to have known of any such custom, nor even that the defendant had introduced the car as a part of its rolling stock, nor yet that the deceased knew that this car constituted a part of the train he was engineer of.    This car was eight feet five inches wide, twenty-seven feet six inches long and about seven feet high.  A standard-gauge (or broad-gauge) car is thirty-four to forty-five feet long, nine feet wide, and about eleven feet high.    The record does not disclose the exact size of a narrow-gauge car.

The instructions given and refused will be considered hereinafter.

1.    It is the duty of the master to furnish to the servant a reasonably safe place and reasonably safe machinery and appliances in which and with which to do the master's work. [Tabler v. Railroad, 93 Mo. 79; Grattis v. Railroad, 153

Mo. 403.] "It is not the duty of the master to furnish any particular kind of tools, implements or appliances. His duty in this respect is to use ordinary care and diligence in selecting and furnishing safe and suitable tools and implements. No inference of negligence can arise from evidence which shows that the implement was such as is ordinarily used for like purposes by persons engaged in the same kind of business." This terse statement of the rule was announced by BLACK, J., in Bohn v. Railroad, 106 Mo. l. c. 433. This court, in Banc, speaking through SHERWOOD, J., in Steinhauser v. Spraul, 127 Mo. l. c. 562, said: "It is well-settled law that an employer is not bound to furnish his employees the safest known appliances, tools or machinery, the latest approved patterns of tools and improvements therein, etc., nor does he render himself liable by failing to discard tools or appliances which are not such, and to supply their places with those which are more safe. [2 Thompson on Neg.; p. 983; Blanton v. Dold, 109 Mo. 64.]"

The servant in entering the service of the master assumes the risks that ordinarily and usually are incident to the business being conducted by the master, and his wages include compensation for injuries received from such risks. In Bradley v. Railroad, 138 Mo. l. c. 302, this court, per MACFARLANE, J., said: "It is equally well settled that a master can conduct his business in his own way, and the servant, knowing the hazards of his employment as the business is conducted, impliedly waives the right to compensation for injuries resulting from causes incident thereto, though a different method of conducting the business would have been less dangerous." To the same effect is Jackson v. Railroad, 104 Mo. 448.

It is also the law, not only in this State but almost universally, that if the master fails in his duty to his servant to furnish safe appliances, and if the servant knows, or by the exercise of ordinary care could know, that the appliances fur-

nished are not altogether or reasonably safe, the servant is not obliged to refuse to use the appliances or quit the service of the master if he reasonably believes that by the exercise of proper care and caution he can safely use the appliances notwithstanding they are not so reasonably safe, and if he does use them and exercise such care and caution and is injured, the servant does not waive his right to compensation for injuries received in consequence, nor is he guilty of contributory negligence. But if the appliance is obviously so dangerous that it can not be safely used even with care or caution, or as it is sometimes said if the danger of using it is patent, or such as to threaten immediate injury, then the servant is guilty of contributory negligence if he uses it, and the master is not liable notwithstanding his prior failure of duty. [Huhn v. Railroad, 92 Mo. 447; Soeder v. Railroad, 100 Mo. l. c. 681; Holloran v. Iron Co., 133 Mo. l. c. 476.]

These settled principles of law are again announced as a predicate for the determination of the principal contention of the defendant on this appeal, that the second instruction given for the plaintiff is erroneous, and also that the court erred in modifying the thirteenth instruction asked by the defendant. Those instructions are as follows:

"2. [Given for Plaintiff]. The court instructs the jury that although you may believe from the evidence that the said John Minnier knew of the alleged defects and insufficiencies in the ties, roadbed, track and trestle, and of the alleged condition, size and weight of said car No. 1001 and of the alleged manner in which it was loaded and of the alleged incompetency and unskillfulness of one of said brakemen all as fully referred to and mentioned in the foregoing instruction, yet such knowledge and information on the part of said Minnier does not prevent or bar the right of the plaintiff to recover in this case, unless you further find that the alleged defects and insufficiencies were so obviously dangerous as to threaten immediate injury to the employees and operators on said train

at the time and place and under the conditions existing at the time of the accident, and if you find said defects and insufficiencies did exist as explained to you in the other instruction, and were the direct cause of the accident, and were known, or by the exercise of ordinary care could have been known, to the defendant, and the said John Minnier notwithstanding his knowledge thereof supposed and had good reason to suppose that he could safely operate said train by the use of care and caution and that he did·use all the care and caution incident to the condition in which he was placed at the time, your verdict and finding must be for the plaintiff."

"13.　[Asked by defendant and modified by the court by adding the words in italics.]　If John Minnier knew, or by the exercise of ordinary care might have known, that standard-gauge car bodies, one or more, were in, and constituted a part of the train which he operated as engineer on November 2, 1897, over the defendant's railroad, and that such cars on narrow-gauge trucks had been prior to that date adopted by the defendant's company as a part of its car equipment, and had been in repeated and ordinary use on defendant's said railroad for thirty days or more prior to said date, and the said John Minnier remained in the services of the defendant, he accepted and took upon himself whatever risk pertained to the operation of that class of cars, and if the jury should believe from the evidence that the accident was caused by such a car becoming derailed by reason of such cars being less safe to operate over narrow-gauge roads than ordinary narrow-gauge cars, the plaintiff can not recover, *on account of the use of said car, if the jury believe that the danger, if any, arising from the use of said car was so obvious as to threaten immediate injury to the employees and operators of said train, in the exercise of ordinary prudence and caution at the time and place and under the conditions existing at the time of the accident.*"

It will be observed that the instruction given for the plaintiff treats of defects and insufficiencies in the ties, road-

bed, track and trestle, as well as of the alleged condition, size and weight of the car No. 1001, and of the alleged manner in which it was loaded, and also of the alleged incompetency and unskillfulness of one of the brakemen, combining in this respect the several acts of negligence charged in the petition, while the instruction asked by the defendant refers only to the liability or excusability of the defendant for its use of the broad-gauge car mounted on the narrow-gauge .trucks.

The plaintiffs' instruction says nothing directly about the assumption by the plaintiff of the risks ordinarily incident to the employment but leaves that feature of the case to be implied from the declaration of law that the knowledge of these defects by the deceased, does not bar the plaintiff's recovery unless the defects were so obviously dangerous as to threaten immediate injury. Whereas the instruction as asked by the defendant impliedly instructs the jury that the defendant had a right to introduce the broad-gauge car as a part of its appliances even if it was more dangerous than the narrow-gauge cars previously in use, and if the deceased knew it was so introduced and remained in the defendant's service, the instruction directly told the jury he assumed the increased risks incident to such use. The modification of this instruction by the court tells the jury that the deceased did not assume such increased risk unless the danger arising from the use of such car was so obvious as to threaten immediate injury even though the car was handled with prudence and caution.

The vice of the plaintiff's instruction is that it did not fully state the law as to the assumption of risks, and was calculated to mislead the jury into believing that the deceased only assumed the risk if the danger was so obvious as to threaten immediate injury.

And the modification of the defendant's instruction would have strengthened the impression of the jury that this was the true meaning of the plaintiff's instruction, because that modification told the jury that the deceased did not assume the risk

unless it was so obvious as to threaten immediate injury even though the car was used with ordinary prudence and caution.

This was manifestly the theory of the law upon which the trial court proceeded, and that theory is not the law.

In the first place, there is absolutely no evidence in this case that a broad-gauge car mounted upon narrow-gauge trucks is an unsafe appliance for a railroad to use. On the contrary all the evidence in the case is that such a car is not only safe but that it is used on all the other narrow-gauge roads that the evidence discloses are in existence. So that there is no foundation whatever to support the charge that such use of such car was negligence, and as there was no evidence of any such negligence but the evidence is just the contrary there was nothing to base such an instruction upon, so far as the use of the car is concerned.

In addition, there is nothing in the case which justified the instruction as to obvious danger threatening immediate injury, so far as the car was concerned, and therefore so much of the plaintiff's instruction number two (and the same is true as to plaintiff's instruction number one) as refers to such obvious danger is erroneous, and the whole of the modification of the defendant's instruction is without any fact in the case to rest upon.

Moreover, the effect of the modification of the defendant's instruction is to tell the jury that a servant only assumes such risks as are so obviously dangerous as to threaten immediate injury. This is not the whole law on the subject and stated in this way it is not the law at all. For it overlooks the rule that the servant assumes the risks ordinarily and usually incident to the employment. It calls attention to the exception to this rule but does not state the rule, and stated as these instructions put it, it makes the exception to the rule, the rule itself.

Both of these instructions, as given, were erroneous.

There is likewise no evidence that this car was overloaded. All the direct testimony of all the persons who had any knowl-

edge of the facts or who qualified themselves to speak on the subject, is that the car was not overloaded, and the only testimony to the contrary is that this car swayed more than the narrow-gauge cars, and from this it is argued that the overloading caused the swaying. This, however, is only argument or deduction, and is not a statement of a fact by any person possessing knowledge of the fact, or competent to draw a deduction.

Counsel have pointed out no testimony supporting the charge that one of the brakemen was incompetent, unskilled or inexperienced, and therefore that element may be eliminated from the consideration of this case.

The only case like the case at bar that the great industry and marked ability of counsel has discovered, is Titus v. Railroad, 136 Pa. St. 618. The negligence charged in that case was placing the body of a broad-gauge car upon the narrow-gauge trucks, used on the narrow-gauge railroad of the defendant, and that said car was so heavily loaded as to be top-heavy (allegations similar to this case) and the further act of negligence in using on said car an unsafe appliance for fastening the body of the car to the trucks (an element not present in this case). The trial developed the fact that, "while on its way to Bradford, on the day given, the train was passing around a curve, at the rate of seven to ten miles an hour, when car 41036" (the broad-gauge car on the narrow-gauge trucks), "was observed to sway from side to side and afterwards to bounce as if off the rails," and then the car turned over, and the plaintiff's son, a brakeman on the train, was killed. The Supreme Court of that State held that there was no negligence shown and reversed the judgment recovered in the trial court by the plaintiff, without remanding the cause. In the course of the opinion Mr. Justice MITCHELL, said: "We have examined all the testimony carefully, and fail to find any evidence of defendant's negligence. The negligence declared upon is the placing of a broad-gauge car upon a narrow-gauge

truck, and the use of 'an unsafe, and not the best appliance, to-wit, the flat center plate;' or, as expressed by the learned judge in his charge, in using on the narrow-gauge road the standard car-bodies, and particularly the New York, Pennsylvania & Ohio car-body described by the witnesses. But the whole evidence, of plaintiff's witnesses as well as of defendant's, shows that the shifting of broad-gauge or standard car-bodies on to narrow-gauge trucks for transportation, is a regular part of the business of narrow-gauge railroads, and the plaintiff's evidence makes no attempt to show that the way in which it was done here was either dangerous or unusual. Haleman says the majority of the bearings fit, and those that do not, have hard-wood blocks put under them, and the blocks are fastened with telegraph wire, and he was not positive but that some were bolted on. The particular car complained of was blocked and wired. Cazely and Richmond say it was the custom to haul these broad-gauge cars on the narrow-gauge trucks, though most of the broad-gauge were Erie cars, of somewhat different construction; and Morris says the car in question was put on a Hays truck, fitted for carrying standard-gauge cars on a narrow-gauge road, and that this particular kind of 'Nypano' car was so hauled quite often. These are plaintiff's own witnesses, and none of them say the practice was dangerous. The nearest approach to such testimony is by Morris, who says he 'had his doubts.' But, even if the practice had been shown to be dangerous, that would not show it to be negligent. Some employments are essentially hazardous, as said by our Brother GREEN, in Railroad v. Husson, 101 Pa. St. 1, of coupling railway cars; and it by no means follows that an employer is liable 'because a particular accident might have been prevented by some special device or precaution not in common use.' All the cases agree that the master is not bound to use the newest and best appliances. He performs his duty when he furnishes those of ordinary character and reasonable safety, and the former is the test of the

latter; for, in regard to the style of implement or nature of the mode of performance of any work, 'reasonably safe' means safe according to the usages, habits, and ordinary risks of the business. Absolute safety is unattainable, and employers are not insurers. They are liable for the consequences, not of danger but of negligence; and the unbending test of negligence in methods, machinery, and appliances is the ordinary usage of the business. No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man. The test of negligence in employers is the same, and however strongly they may be convinced that there is a better or less dangerous way, no jury can be permitted to say that the usual and ordinary way, commonly adopted by those in the same business, is a negligent way for which liability shall be imposed. Juries must necessarily determine the responsibility of individual conduct, but they can not be allowed to set up a standard which shall, in effect, dictate the customs or control the business of the community."

The use of this car, under the facts as disclosed by this record can not be said to constitute negligence.

This leaves only the averments of and proofs as to the condition of the track, etc. The testimony is as conflicting as it is possible for witnesses to make it. This court would not disturb the finding of the jury under such conditions, if the jury had been properly instructed. If the testimony of the plaintiff's witnesses is true, it is incomprehensible how any train could ever have passed safely over this road. Yet trains, including this broad-gauge car, had passed over it in safety many times during the thirty days immediately preceding the accident. If the spreading of the rail half an inch, caused the front trucks of this car to leave the tracks, or if it was caused by a low or loose joint, it is hard to understand why the rear trucks of this car did not also leave the track, and also why the engine did not leave the track. If there were as many

rotten cross-ties as the plaintiff's evidence shows between the point this car left the track, 110 or 115 feet north of the trestle, and the point on the trestle where the car stopped, it is hard to understand why this car did not sooner turn over, for it was the last freight car to turn over and ran about three hundred feet with the forward trucks on the cross-ties, and did not turn over until it was dragged over by the narrow-gauge cars in its rear. On the other hand, if the testimony of the defendant's witnesses as to the condition of the track, etc., is true, then it is hard to comprehend why this car left the track at all. These, however, are problems the law leaves to the jury to solve, and it is not the practice of this court to interfere with the verdict under such conditions.

For the error in giving the plaintiff's second (and first) instruction and in modifying the defendant's thirteenth instruction, hereinbefore pointed out, the judgment of the circuit court is reversed and the cause remanded for further trial in conformity herewith. All concur.